**David W. German, State Bar No. 252395**
**VANAMAN GERMAN LLP**
14001 Ventura Boulevard
Sherman Oaks, CA 91423
Tel.: (818) 990-7722
Fax: (818) 501-1306
dgerman@vanamangerman.com

**Melinda Bird, State Bar No. 102236**
melinda.bird@disabilityrightsca.org
**Andria Seo, State Bar No. 327069**
Andria.Seo@disabilityrightsca.org
**Lauren Lystrup, State Bar No. 326849**
Lauren.Lystrup@disabilityrightsca.org
**DISABILITY RIGHTS CALIFORNIA**
350 S. Bixel Street, Suite 290
Los Angeles, CA 90017
Tel.: (213) 213-8000
Fax: (213) 213-8001

Attorneys for Plaintiff M.C.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.C., a minor, by and through his guardian ad litem S.B.,  on behalf of themselves and all others similarly situated,<br><br>          Plaintiff,<br><br>vs.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT, a local educational agency, and CALIFORNIA DEPARTMENT OF EDUCATION,<br><br>          Defendants. | CASE NO.: 2:20-cv-09127-CBM-E<br><br>**SECOND AMENDED COMPLAINT**<br><br>**CLASS ACTION**<br><br>1. Appeal of Special Education Administrative Hearing Decision Arising under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*<br><br>2. Violations of The Americans With Disabilities Act, 42 U.S.C. § 12101, *et. seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et. seq.*; and the IDEA, 20 U.S.C. § 1400 *et seq.*<br><br>3. Declaratory, Injunctive Relief and Damages |

## **INTRODUCTION**

1.      Enshrined in federal law is the now-longstanding principle that students with disabilities must have the same access to public educational benefits as any other student. Despite this, Los Angeles Unified School District and the California Department of Education have maintained regulations, policies and practices that effectively suspend these federal mandates for the "extended school year," which disabled students need to prevent regression and learning loss. These practices force special education students who are fully integrated in a general education classroom during the regular school year into inappropriate, segregated classrooms during the summer, or dissuade them from attending at all.

2.      Plaintiff M.C. had this exact experience, as do *thousands* of other students just like him throughout California. M.C. now seeks to enforce federal law as applied to extended school year programs.

3.      Plaintiff M.C. brings this action following an administrative hearing decision ("Decision") rendered by the California Office of Administrative Hearings ("OAH") in a special education administrative hearing under the Individuals with Disabilities Education Improvement Act ("IDEA") 20 U.S.C. §§ 1415 et seq., and designated as OAH case no. 2019080679. The Decision was issued on July 6, 2020.

4.      Plaintiff seeks to reverse the Decision in OAH case no. 2019080679 with respect to both issues decided therein. Additionally, Plaintiff seeks to compel Defendant Los Angeles Unified School District ("LAUSD") to provide Plaintiff with an appropriate educational program in the least restrictive environment appropriate to meet his needs in accord with 20 U.S.C. section 1412(a)(5). Plaintiff also seeks to recover attorneys' fees and expenses incurred in connection with the underlying administrative proceeding and this action pursuant to 20 U.S.C. § 1415(i)(2)(B).

5.      LAUSD denied M.C. a free appropriate public education ("FAPE") in the least restrictive environment appropriate to meet his needs during the extended school year ("ESY") of 2019. This occurred because LAUSD policies for extended school year placement do not allow Individualized Education Program ("IEP") teams to consider the least restrictive

placement for students who are placed in general education classrooms during the regular school year. When applied to M.C. in April of 2019, these discriminatory policies forced District members of his IEP team to offer him an ESY program that denied him equal access to a public educational program, placed him in an unnecessarily restrictive setting, denied him access to an appropriate curriculum, and removed him from appropriate peer models for communication, behavior, and social skills.

6.      Incredibly, California Department of Education ("CDE") endorses and condones LAUSD's discriminatory policies and that of other school districts across the State. A regulation promulgated by CDE, Cal. Code Regs. tit. 5, § 3043(g), applies to extended school year services. It expressly permits districts to disregard IDEA's requirement for placement in the least restrictive setting when a student is fully included in a regular classroom during the rest of the school year. This regulation is flatly contrary to IDEA, as guidance from the U.S. Department of Education has made clear that the statute's requirement to place students in the least restrictive environment unquestionably applies to the extended school year.

7.      Similarly, federal protections against disability discrimination apply to California's ESY programs. CDE and LAUSD are both subject to Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973. These statutes require public entities to offer services in the most integrated setting appropriate to disabled individuals' needs, and to provide accommodations to enable them to achieve equal opportunity and benefit as others do. CDE's ESY regulation and LAUSD's policies and practices at issue here flatly violate the ADA and Section 504 and their implementing regulations.

8.      Plaintiff seeks declaratory and injunctive relief against both LAUSD and CDE on his own behalf and that of other similarly situated disabled students. Defendants have taken actions and promulgated regulations and/or policies that have denied disabled students their rights under the IDEA. They have denied M.C. and other students equal access to public educational programs on the basis of disability-related characteristics, and have discriminated against then on the basis of disability, in violation of the ADA and Section 504. Plaintiff seeks a permanent injunction prohibiting CDE from implementing its ESY regulation, and barring

1   LAUSD from implementing practices, policies, and procedures that deny students with

2   disabilities full and equal access to its extended school year programs, and the opportunity to be

3   educated within the least restrictive environment appropriate to meet their needs, as well as

4   damages related to these violations.

5                              **JURISDICTION AND VENUE**

6          9.     This action for declaratory and injunctive relief arises under the Individuals with

7   Disabilities Education Act (IDEA), 20 U.S.C. § 1415(e), Title II of the Americans with

8   Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act

9   of 1973 ("Section 504"), 29 U.S.C. § 794.

10          10.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331

11   and 1343, because the matters in controversy arise from federal questions under the Constitution

12   or laws of the United States. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction

13   to declare the rights of the parties and to grant all further relief deemed necessary and proper.

14          11.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because the events

15   which are the subject of this complaint took place within the Central District of California, in

16   which Defendant Los Angeles Unified School District is situated and Plaintiff resides.

17                                    **PARTIES**

18          12.    Plaintiff M.C. is a minor and a resident of the city of Los Angeles, California. At

19   all times relevant to this action, he has resided with his mother within the boundaries of the Los

20   Angeles Unified School District. M.C. qualifies as an individual with a disability for purposes

21   of the IDEA, the ADA, and Section 504 of the Rehabilitation Act of 1973. He qualifies for

22   special education services under the IDEA on the basis of Intellectual Disability. Plaintiff is

23   under the age of 18 and brings this action through his guardian ad litem, S.B.

24          13.    Defendant Los Angeles Unified School District ("District" or "LAUSD") is a

25   public local educational agency and a public entity under the laws of the State of California, and

26   is located in Los Angeles County, California. The District is a local educational agency

27   organized pursuant to the applicable provisions of the California Education Code and charged

28

1  by federal and state law with providing students with disabilities who live within its boundaries

2  with a free and appropriate educational program.

3        14.    Defendant California Department of Education ("CDE") is the department of

4  California's state government responsible for administering and enforcing laws related to

5  education. Cal. Ed. Code § 33308. Pursuant to California Education Code sections 33300–16,

6  CDE is responsible for cooperating with federal and state agencies in prescribing rules,

7  regulations, and instructions required by those agencies. CDE is also responsible for ensuring

8  that children in California receive a free appropriate public education. 20 U.S.C.

9  §§ 1412(a)(1)(A), (a)(11)(A).

10  **CLASS ALLEGATIONS**

11        15.    Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure,

12  Plaintiff brings this action for injunctive and declaratory relief on his own behalf and on behalf

13  of all similarly situated students. Plaintiff seeks to represent the following Classes in this matter,

14  pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), as follows:

15      STATE-WIDE CLASS: All California students who, now or in the future, have an

16      Individual Education Plan that specifies (a) integration in the regular classroom and (b)

17      their need for extended school year services pursuant to 34 C.F.R. § 300.106.

18      LAUSD SUBCLASS: All students who, now or in the future, reside within the

19      boundaries of LAUSD and have an Individual Education Plan that specifies (a)

20      integration in the regular classroom and (b) their need for extended school year services

21      pursuant to 300 C.F.R. § 300.106.

22        16.    This action is an appropriate class action under Rule 23(b)(2), as LAUSD and

23  CDE have acted or refused to act on grounds that apply generally to each Class, so that final

24  injunctive relief or corresponding declaratory relief is appropriate respecting each Class as a

25  whole.

26        17.    The members of these Classes are so numerous that joinder of all such persons is

27  impracticable. Approximately half of the special education students in California and in

28  LAUSD are educated in regular classrooms. In LAUSD, 33,189 special education students

attend general education programs.[1] Statewide, approximately 399,331 special education students were placed in general education classes for 80% or more of their school day.[2] If even a small percentage of these fully included students also qualify for extended school year services, both the Statewide Class and the LAUSD Class will include thousands of students.

18.     Individual action by class members is impracticable. Class members face significant barriers to asserting their rights, including misinformation from their school districts and incorrect rulings in administrative hearings.

19.     There are questions of law and fact common to each Class identified above, namely:

    a. Whether LAUSD and CDE have regulations, policies, procedures, practices that violate IDEA by:

        i.   preventing class members from receiving extended school year services in the least restrictive environment as required by IDEA,

        ii.  denying them access to the continuum of placements as required by IDEA; and

        iii. failing to provide individualized consideration of the appropriate duration of extended school year services and any necessary accommodations there.

    b. Whether LAUSD and CDE have regulations, policies, procedures, and practices that discriminate against class members in violation of the ADA and Section 504 by:

        i.   denying them extended school year services in the most integrated setting

---

[1] Los Angeles Unified School District, Division of Special Education, Fingertip Facts 2019-2020, available at: https://achieve.lausd.net/cms/lib/CA01000043/Centricity/Domain/1220/SPED%20Fingertip%20Facts%2019.20.pdf.

[2] U.S. Department of Education, *42nd Annual Report to Congress on the Implementation of the Individuals with Disabilities Education Act, 2020*, 147 & 273 (Jan. 2021).

appropriate to their needs as required by the ADA and Section 504,

    ii.  denying them equal access to extended school year services,

    iii.  providing them with extended school year services that are not as effective as those provided to other students,

    iv.  failing to modify their extended school year services as needed to avoid discrimination,

    v.  using methods of administration that result in or perpetuate discrimination against Class members in the delivery of extended school year services.

20.    The claims of Plaintiff M.C. are typical of the claims of the Classes, identified above, in that he is a student with a disability, has an IEP that specifies placement in a regular classroom, and requires extended school year services.

21.    Plaintiff M.C. is an adequate class representative because he suffers the same injury as other class members. He will fairly and adequately protect the interests of the Class and Subclass. Plaintiff M.C. does not have any interests antagonistic to the members of any Class. The relief sought by Plaintiffs will inure benefit to the members of each Class.

22.    Plaintiff's counsel are experienced, skilled, and knowledgeable about special education, civil rights litigation, disability rights, and class action litigation.

23.    Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for CDE and LAUSD or could be dispositive of the interests of the other members or substantially impair or impede the ability to protect their interests.

24.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. A multiplicity of suits with consequent burden on the courts and Defendants should be avoided. It would be virtually impossible for all class members to intervene as parties in this action.

## STATUTORY SCHEME – IDEA

25.     The IDEA requires states receiving federal assistance for the education of students with disabilities to establish procedures assuring that special education students are educated in the least restrictive environment and that "[t]o the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.114-120; Cal. Ed. Code § 56040.1. Section 1412(a)(5)(A) is also referred to as the IDEA's "mainstreaming" requirement. *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. ex rel. Holland [Rachel H.],* 14 F.3d 1398, 1403 (9th Cir. 1994). This requirement reflects "Congress's preference for educating children with disabilities in regular classrooms with their peers." *Id.*

26.     The statutory and regulatory provisions specifying the contents of a student's IEP also emphasize the importance of educating students with disabilities in regular classes and including them in activities with nondisabled children. 20 U.S.C. §§ 1412(a)(4), 1414(d)(1)(A)(i)(IV), (V); 34 C.F.R. § 300.320(a)(4), (5).

27.     School districts "must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services," and that the continuum must include "instruction in regular classes, special classes, special schools, home instruction," and instruction in hospitals and institutions. 34 C.F.R. § 300.115; see also Cal. Ed. Code § 56361.  The "removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); see also Cal. Ed. Code § 56040.1. If an IEP team determines that a child cannot be educated in a general education environment, then the least restrictive environment analysis requires determining whether the child has been

*M.C. v. LAUSD,* Case No.: 2:20-cv-09127                                                    Second Amended Complaint

mainstreamed to the maximum extent that is appropriate in light of the continuum of program options. *Daniel R.R. v. State Board of Educ.*, 874 F.2d 1036, 1050. (5th Cir. 1989).

28.     For some children, education during the summer months may be necessary to provide a FAPE.  Accordingly, the IDEA's implementing regulations provide that school districts "must ensure that extended school year services are available as necessary to provide FAPE" if a child's IEP team determines that such services are needed. 34 C.F.R. § 300.106. Generally, extended school year services are needed when interruption of the student's services may cause regression and learning loss that will be difficult for the student to recoup.

29.     The federal regulation regarding extended school year services states that a public agency may not "(i) limit extended school year services to particular categories of disability; or (ii) unilaterally limit the type, amount, or duration of those services. 34 C.F.R. § 300.106 (a)(3).

30.     The U. S. Department of Education has long held the position that the IDEA's least restrictive environment requirement applies to extended school year programs, and that options on the continuum of placements must be made available to the extent necessary to implement a child's IEP. The Office of Special Education Programs ("OSEP"), which is part of the U.S. Department of Education and administers IDEA, expressed this position in a series of policy letters that provide written guidance and clarification regarding implementation of the IDEA. *See Letter to Myers*, 213 IDELR 255 (August 30, 1989); OSEP, *Letter to Myers*, 16 IDELR 290 (December 18, 1989); OSEP, *Letter to Skiba*, 18 IDELR 592 (December 16, 1991).

31.     The Second Circuit has concurred with the Department of Education that "for the ESY component of [an] educational program as for the school-year component, a school district must consider an appropriate continuum of alternative placements, and then must offer the student the least restrictive placement from that continuum that is appropriate for the student's disabilities." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014).  In response to the school district's complaint that it did not have an extended school year program that met the student's needs, the court found that "[u]nder the IDEA, a disabled student's least restrictive environment refers to the least restrictive educational setting consistent

with that student's needs, not the least restrictive setting that the school district chooses to make available." *Id.* The U.S. Department of Justice and Department of Education filed an *amicus curiae* brief at the request of the Second Circuit in the *T.M.* case, stating that the student's position was in accord "with the longstanding and consistent position of the Department of Education." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.,* 2014 WL 3850786 at 14-16 (2nd Cir. 2014) (Amicus letter brief, discussing and summarizing OSEP Policy letters listed above).

32.     As defined by 20 U.S.C. § 1401(32), Defendant CDE is the "State educational agency" for California "primarily responsible for the State supervision of public elementary schools and secondary schools" throughout California.

33.     The California Education Code directs CDE to, "[i]n accordance with the requirements of federal law, adopt regulations for all individualized education programs for individuals with exceptional needs, including programs administered by other state or local agencies." Cal. Ed. Code § 56100(i).

34.     CDE has promulgated a regulation that acknowledges that school districts in California must, in accordance with 34 C.F.R. § 300.106, provide extended school year programs for each individual with exceptional needs who has unique needs and requires special education and related services beyond the regular academic year. Cal. Code Regs. tit. 5, § 3043.

35.     However, CDE's regulation also states: "If during the regular academic year an individual's IEP specifies integration in the regular classroom, a public education agency is not required to meet that component of the IEP if no regular summer school programs are being offered by that agency." Cal. Code Regs. tit. 5,§ 3043(g). This regulation is flatly inconsistent with the IDEA and its requirements for a continuum of placements and least restrictive environment.

36.     CDE's regulation further states that extended school year services "shall be provided for a minimum of 20 instructional days." Cal. Code Regs. tit. 5, § 3043(d). The regulation does not clarify that students may require more than 20 days of extended school year services to prevent regression, based on their individual needs. The regulation also does not

1   reflect the federal ESY requirement, 34 C.F.R § 300.16, that school districts may not limit the

2   type, amount or duration of ESY services.

3       37.     Under 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3), students have a right to bring a

4   civil action in the district court of the United States to seek redress for IDEA violations.

5   Complaints against state educational agencies seeking declaratory and injunctive relief for

6   failure to comply with their IDEA obligations, resulting in a denial of FAPE, fall within the

7   scope of this private right of action. *See, e.g., S.B. by & through Kristina B. v. California Dep't*

8   *of Educ.*, 327 F. Supp. 3d 1218, 1241 (E.D. Cal. 2018); *Morgan Hill Concerned Parents Ass'n*

9   *v. Cal. Dep't of Educ.*, No. 2:11-cv-3471-KJM-AC, 2013 WL 1326301, at *6 (E.D. Cal. Mar.

10  29, 2013) ("the court finds plaintiffs have a private right of action to challenge CDE's alleged

11  systemic noncompliance with its IDEA obligations").

## STATUTORY SCHEME – DISABILITY DISCRIMINATION

13      38.     Congress enacted the ADA, 42 U.S.C. § 12101 et seq., to provide a clear and

14  comprehensive national mandate for the elimination of discrimination against individuals with

15  disabilities and to provide strong and consistent standards for identifying such discrimination.

16  42 U.S.C. § 12101(b)(1)&(2).

17      39.     The ADA is based on Congress's findings that, inter alia, (i) "historically, society

18  has tended to isolate and segregate individuals with disabilities, and, despite some

19  improvements, such forms of discrimination against individuals with disabilities continue to be

20  a serious and pervasive social problem," 42 U.S.C. § 12101(a)(2). In addition, "individuals with

21  disabilities continually encounter various forms of discrimination, including … relegation to

22  lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C.

23  § 12101(a)(5).

24      40.     In enacting the ADA, Congress also found that "discrimination against

25  individuals with disabilities persists in such critical areas as … education." 42 U.S.C.

26  § 12101(a)(3).

27      41.     Title II of the ADA mandates that "no qualified individual with a disability shall,

28  by reason of such disability, be excluded from participation in or be denied the benefits of the

---

11

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130.

42.    Title II of the ADA applies to all of the activities of public entities, including providing education. Each Defendant is either a public entity subject to Title II of the ADA or an official responsible for supervising the operations of a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1).

43.    The ADA directs the Attorney General to promulgate regulations enforcing Title II of the ADA and provides guidance on their content. The regulations promulgated by the Attorney General require public entities to "make reasonable modifications" to their programs and services "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7).

44.    The regulations also specify that it is unlawful discrimination for a public entity to:

    a.    "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii);

    b.    "Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii);

    c.    Fail to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d), which the Attorney General has defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible," 28 C.F.R. pt. 35, App. A, p. 450; or

    d.    "[U]tilize criteria or methods of administration … [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the

1    objectives of the public entity's program with respect to individuals with

2    disabilities," 28 C.F.R. § 35.130(b)(3)(ii).

3    45.    The Supreme Court has held that discrimination prohibited under Title II of the

4    ADA includes the needless isolation or segregation of persons with disabilities. *Olmstead v.*

5    *L.C.*, 527 U.S. 581, 600 (1999) ("unjustified institutional isolation of persons with disabilities is

6    a form of discrimination"); *see also* 2011 Statement of the US Department of Justice on

7    Enforcement of the Integration Mandate of Title II of the ADA and *Olmstead*, June 22, 2011

8    ("DOJ 2011 Statement").

9    46.    Section 504 of the Rehabilitation Act of 1973 provides in relevant part: "No

10   otherwise qualified individual with a disability . . . shall, solely by reason of her or his

11   disability, be excluded from the participation in, be denied the benefits of, or be subjected to

12   discrimination under any program or activity receiving Federal financial assistance . . . ." 29

13   U.S.C. § 794(a); see also 45 C.F.R. §§ 84.4(b), 84.21, 84.52.

14   47.    The regulations implementing Section 504 provide protections that parallel those

15   under the ADA.

16   48.    Both CDE and LAUSD are recipients of federal financial assistance within the

17   meaning of Section 504, and its implementing regulations.

18   49.    Special education services are a "program or activity receiving Federal financial

19   assistance" because LAUSD and CDE receives federal financial assistance for these services.

**STATEMENT OF FACTS**

21   50.    Plaintiff M.C. filed a due process hearing request with the California Office of

22   Administrative Hearings (OAH) on August 16, 2019, with LAUSD as Respondent. Plaintiff's

23   case was numbered OAH case no. 2019080679.

24   51.    A hearing was held before Administrative Law Judge Paul H. Kamoroff on June

25   2, 3, 4, and 9, 2020. The ALJ issued a decision on August 16, 2020. A true and correct copy of

26   the OAH Decision is attached to this complaint as Exhibit "A" and incorporated herein by

27   reference.

28

52.     M.C. is a student with diagnoses of Down syndrome, type 1 diabetes, and a specific antibody deficiency. He is eligible for special education on the basis of Intellectual Disability.

53.     M.C. has been educated within a general education setting since first grade. He is currently a fourth-grade student.

54.     M.C. has progressed enormously and had significant success within the general education setting, which is considered an "inclusive placement." M.C. has made progress academically. The general education classes he has attended are taught using the "core curriculum." M.C. is exposed to this curriculum although his work is modified to facilitate his access to the material and for assessment purposes. With respect to communication and social emotional learning, he has developed real friendships with other children in the general education setting.

55.     LAUSD makes an artificial distinction between the core curriculum, which can be modified to suit students' needs, and what it calls an "alternative curriculum." M.C.'s IEP states that he is on the alternative curriculum, but this is only for assessment purposes. In all other ways, he participates in the core curriculum, with inclusion supports, alongside his non-disabled peers.

56.     The teacher who provided M.C. with inclusion support in both first and second grades spoke to his mother about M.C.'s inclusion in general education during first and second grade.  She described this as an "ideal inclusion experience."

57.     During first grade, in the 2017-2018 school year, M.C.'s IEP team agreed that he qualifies for extended school year services because of the risk of regression and learning loss. When his mother took M.C. to begin his summer school program, they found that LAUSD had assigned him to an alternate curriculum classroom. Her observation of the classroom was that it was chaotic and included no typical peer models for language or behavior. M.C. was so alarmed by the noise and disorganization of the class that he refused to enter the classroom.

58.     M.C.'s mother, S.B., requested that the site administrator place him in the core curriculum ESY class that was available at the same location. LAUSD staff told her that it was

not possible because his IEP stated that he was on alternate curriculum and that all students on the alternate curriculum had to attend the alternate curriculum class. Because S.B. believed that attending the alternate curriculum class was inappropriate and would lead to M.C.'s regression, she did not send him to the extended school year program during the summer of 2018.

59.     M.C. had another successful year in the general education setting for second grade during the 2018-2019 school year. At his annual IEP, which was convened on April 3, 2019, the team determined that M.C. had made progress in all areas, and that he should continue being fully included in third grade during the 2019-2020 school year. The IEP team was in complete consensus that the least restrictive environment within which M.C. could be effectively educated was a general education classroom.

60.     M.C.'s IEP team also agreed that he again qualified for extended school year services. However, there was no discussion of how long it should be or of whether he could in an inclusive general education placement for summer. S.B. believed that a general education placement would be best for M.C. but understood that the District did not offer such programs. Because she was aware that the two types of ESY classes that the District did offer were very different, S.B. asked the team that M.C. be placed in the "core curriculum" program that more closely resembled his general education placement during the school year. S.B. explained to the IEP team that the program offered to M.C. for 2018 the extended school year program had been in an alternate curriculum classroom that she believed was inappropriate. She explained why M.C. would be more appropriately placed in the core curriculum class and, as no general education option was available, asked District members of the IEP team to indicate on his IEP that he should be placed in that program.

61.     District members of the IEP team told her that they had no ability to determine which class M.C. would be placed in. They said "that their hands were tied," and that "there was nothing they could do because [M.C.] was on the alternate curriculum so he had to go into the alternate curriculum classroom for ESY." District members of the team stated that the IEP team had no discretion in the matter and that if she wanted to challenge the placement she would have to file for an administrative due process hearing.

62.     S.B. explained to District members of the team at length why she thought it was important for M.C. to remain in a core curriculum classroom for the extended school year program. No member of the IEP team expressed concern that M.C. would not be able to be successful in a core curriculum summer classroom. Nor did any member of the IEP team assert that M.C. would receive any specific benefit if he attended the alternate curriculum classroom. The entirety of the discussion related to ESY was about how her request was against the district policy and that the IEP team was simply not allowed to offer anything other than the alternate curriculum class.

63.     Daniel Saborio was the District administrator who was in charge of M.C.'s April 3, 2019 IEP meeting. Mr. Saborio testified in the administrative hearing that all members of M.C.'s April 2019 IEP team had agreed that the least restrictive environment within which he could be appropriately educated was the general education setting. He confirmed that the IEP team lacked any discretion with respect to determining an appropriate ESY placement. He stated that the team's sole responsibility was to determine whether a student was eligible for ESY and testified that once that determination had been made, the team made no further decisions.

64.     In response to questions about how District IEP teams determine which ESY class to place an individual student, Mr. Saborio repeatedly stated that, "curriculum drives placement" for ESY. Mr. Saborio testified that he did not believe it was an option for the IEP team to place M.C. in the core curriculum program because M.C.'s IEP stated that he was on the alternate curriculum and, therefore, he had to attend the alternate curriculum ESY program. When asked if the team could have provided M.C. with inclusion support to modify his work if he had somehow been placed in the core curriculum ESY class, Mr. Saborio testified that "it wasn't an option," because, "ESY is only set up for one or the other."

65.     Mr. Saborio described the extreme variation students showed in how quickly they lost and regained academic skills, yet when asked about whether District IEP teams considered an appropriate length of ESY programs to address these differences, he stated that "IEP teams just determined eligibility. The District provided the program. We didn't custom

make the programs in that aspect." His testimony was clear: once an IEP team determines that a student is eligible for a classroom based ESY program, the IEP team has no further discretion. A student's "curriculum drives placement," and all other decisions about the length and nature of a student's ESY program are left to the discretion of the District. The IEP team is not allowed to make changes to the ESY program in light of a student's individual needs.

66.     Hiyas Ambrosio was the inclusion specialist who worked with M.C. during the 2019-2020 school year.

67.     Ms. Ambrosio described M.C. as a student with a moderate disability profile. She agreed that research has established that for students like M.C., being educated in inclusive classrooms leads to significantly better outcomes in core academic skills like reading and math. She opined that the reason students who receive their education in general education classrooms show increased academic skills despite doing very modified work was, "probably because they have greater access to the core curriculum."

68.     Ms. Ambrosio agreed with the determination made by the April 3, 2019 IEP team that M.C. could be appropriately educated in general education placement with supports as his LRE. She further testified that he had in fact made progress on all his goals during the regular school year subsequent to the IEP at issue, during which she supported him within a general education setting. She also testified that at M.C.'s April 2020 IEP, which she attended, all members of the team continued to agree that M.C.'s LRE was placement in a general education setting as a fully included student.

69.     Ms. Ambrosio testified that she had participated in the IEP meetings of over 100 students who were on the alternate curriculum but whose LRE during the regular school year was a general education setting. She also testified that not one IEP team considered providing any of those students with an ESY placement consistent with their LRE for the regular school year.

70.     Dr. Kathleen Whitbread testified as an expert in teaching core academic skills to students with Down syndrome. She also has extensive experience working in summer school programs for students like M.C. and testified that she has observed hundreds of such programs.

She observed M.C. in school and at home and had completed a thorough review of his academic records in anticipation of her testimony. Dr. Whitbread testified in the hearing below that among the hundreds of students with Down syndrome that she has worked with, M.C.'s profile was not atypical, and that he fell in the mild to moderate range of disability.

71.    Dr. Whitbread testified that the overwhelming research consensus related to the education of students like M.C. was that they do best in a general education classroom among their same age peers. She stated that students like M.C. who are educated in general education settings have outcomes far superior to those of students educated in special day classes "in every area that we measure," including academic performance, communication and social skills. She stated that access to the core curriculum "is a critical ingredient to having a positive outcome" even when other aspects of instruction or the classroom are not ideal.

72.    Dr. Whitbread testified that summer school programs for students like M.C. should be provided in the most typical environment possible because the research strongly establishes that outcomes are superior in such settings and "none of that changes just because it's summer." She testified that maintaining continuity of placement and program during ESY is important in order to avoid regression and that placing a student in a completely different type of setting during ESY works against the maintenance of skills.

73.    Dr. Whitbread's testimony regarding the curriculums that were provided in the two ESY classes during the summer of 2019 was uniquely authoritative because she was the only witness to have taught students using both sets of materials. She had intimate familiarity with each of the set texts and was conversant in the extent to which their use was, or was not, supported by outcomes-based research.

74.    Dr. Whitbread testified that research has conclusively established that curriculum that is effective for students with learning disabilities, which was used in the District's core curriculum ESY class, is effective for students with intellectual disabilities. She testified that the curriculum chosen for the core curriculum ESY program had been proven by research to be effective and was "a high-quality evidence-based curriculum." She testified that having access to such a curriculum would have helped M.C. avoid regression. Further, she testified that

because the curriculum used was so well established, the teaching materials provided with it include instruction on how to modify the materials and to implement the curriculum with fidelity for students working at different levels. Dr. Whitbread testified that she believed that M.C. could benefit from the curricular materials used in the core curriculum classroom with very little modification. On the other hand, Dr. Whitbread testified that the materials being used in LAUSD's alternate curriculum summer school program were designed for students with academic skills far below M.C.'s, that the materials were not evidence-based, and that they would not be appropriate to prevent his regression.

75.     Dr. Whitbread was conversant in the primary research about all of the curricula at issue in this case. She described her extensive but unsuccessful efforts to find any primary research which supported the effectiveness of the materials that were to be used in the District's alternate curriculum ESY class, which was called the "Unique Learning System." Specifically, she testified that she had found no studies or independent references that established that this program was evidence-based. Dr. Whitbread also testified that the social skills program taught in the alternate curriculum ESY classroom had been conclusively established to be ineffective as a means to teach social skills.

76.     Although she stated that placement among typical peers would have been preferable, Dr. Whitbread testified that the District's core curriculum ESY class would have been more appropriate for M.C. than the alternate curriculum classroom. She said this was the case not only because of the proven efficacy of its curriculum, but also because the students in that class would provide more typical social, behavioral, and language models. She testified that even though the District's core curriculum ESY class was not a fully inclusive environment, it was a more appropriate setting for M.C. than the alternative curriculum class offered by LAUSD.  She testified that research has established "that the farther you get away from the regular typical classroom . . . every incremental step away from [a general education classroom] results in a poorer outcome for kids with Down syndrome."

77.     Tiffany Sepe, an alternate curriculum specialist for the District, testified as a rebuttal witness for the District. The sole purpose of her testimony appears to have been to

provide support for the claim that that the District's alternate curriculum ESY program in 2019 provided an evidence-based curriculum.

78.     Ms. Sepe agreed that for an instructional practice to be evidence-based, it must be shown to have improved student outcomes when implemented.  On direct examination she claimed that the alternative curriculum for ESY 2019, including the use of the Unique Curriculum (ULS), was evidence-based. She further testified that a document she received from the publishers of the Unique Curriculum supported her belief that it was evidence-based. She testified that the sole basis for her opinion that ULS was evidence-based was that document. She admitted that she had no independent knowledge of, or familiarity with, any primary research which indicated that ULS is an evidence-based intervention.

79.     When Ms. Sepe was questioned about the claims made in the document, she was unable to point to any citation that supported the implication that the "evidence-based practices" described in the document had been shown to be evidence-based as included within the Unique Curriculum. When it was pointed out that, although deceptively presented to suggest that the Unique Curriculum was evidence-based, the document she had been provided actually made no claim to any evidence-based support for the implementation of the Unique Curriculum as a means to improve student outcomes, she had no response.

80.     No other District witness provided any evidence tending to show that the Unique Curriculum was effective for students like M.C. or that it had been proven effective.

## FIRST CAUSE OF ACTION

**Violations of Individuals with Disabilities Education Act (IDEA)**
**20 U.S.C. § 1400 et seq.**
**Against LAUSD**

81.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

82.     LAUSD has adopted policies and practices that violate IDEA's requirement that IEP teams must make placement decisions based on a child's unique needs (34 C.F.R. § 300.116(a)) and in conformity with the requirements of IDEA. LAUSD IEP teams considering ESY placements for students like M.C.:

- Are not allowed to offer placement in a general education summer school program outside of the District;
- Have no discretion to consider whether a core curriculum ESY class would be more appropriate for an individual student;
- Cannot individualize the length of a student's ESY program; and,
- Have no discretion to provide services such as inclusion support that the District has decided not to offer during ESY.

83. For students like M.C. who need extended school year services to prevent regression and learning loss, LAUSD fails to offer a full continuum of programs, fails to consider placement in the least restrictive environment, fails to offer individualized program modifications and inclusion supports and fails to consider whether a longer duration of ESY is appropriate to the student's needs.

84. LAUSD's actions and inaction all violate IDEA and its implementing regulations by denying M.C. and others similarly situated LRE, a full continuum of placements, and accommodations or inclusion supports in ESY placements. LAUSD also limits extended school year services to particular categories of disability and unilaterally limits the type, amount, or duration of those services in violation of 34 C.F.R. § 300.106(a)(3).

85. The OAH Decision appealed here regarding Plaintiff M.C. was incorrect and inconsistent with the requirements of the IDEA. The Decision was not based upon a careful and impartial consideration of all the evidence. The Administrative Law Judge failed to consider all of the evidence presented, reached erroneous conclusions of law, and otherwise failed to issue a decision that is careful and impartial.

86. The main issue decided in the case below was whether LAUSD denied M.C. an appropriate educational program by failing to offer him a program in the least restrictive environment appropriate to meet his needs, as required by the IDEA, during extended school year in 2019. The evidence adduced at hearing made clear that LAUSD failed to offer M.C. a program in what District personnel testified was M.C.'s least restrictive environment, which was a general education classroom.

87.     The OAH Administrative Law Judge disregarded clear evidence that District policy and practice violated the rights of students such as M.C. who are educated during the regular school year within the general education setting but who are assessed using alternate curriculum standards. As applied to M.C., Defendant LAUSD's policies precluded his IEP team from considering his individual educational needs and denied him an appropriate educational program in the least restrictive environment. The ALJ erred because his decision was contrary to the unambiguous mandates of federal law regarding the provision of extended school year programming to students such as M.C.

88.     The ALJ also erred in disregarding LAUSD's failure to provide a continuum of placements that included a regular classroom setting for extended school year services. District personnel testified that, due to District policy, the only extended school year placement available to M.C. was a special day class that used an alternate curriculum, and that neither a general education classroom nor the core curriculum special day class could be considered.

89.     The ALJ also erred in upholding LAUSD policies and practices that prevent an individual determination regarding the length of M.C.'s extended school year program, thereby predetermining the type and extent of individual programming he would be offered.

90.     As the OAH Decision below is contrary to clearly established law, Plaintiff seeks this Court's de novo review and reversal of the Decision with respect to both issues decided, and the issuance of appropriate relief.

## SECOND CAUSE OF ACTION

**Violations of Individuals with Disabilities Education Act (IDEA)**
**20 U.S.C. § 1400 et seq.**
**Against CDE**

91.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

92.     As the state educational agency, CDE has an obligation to ensure that a free appropriate public education is available to all children with disabilities residing in the state. 20 U.S.C. § 1412(a)(1)(A). CDE also has an explicit responsibility to supervise all educational programs for children with disabilities in the state and to ensure that the requirements of the

IDEA are met. 20 U.S.C. §§ 1412(a)(11)(A) and 1416(a)(1)(C); 34 C.F.R. § 300.149(a); *see also* Cal. Ed. Code §§ 56100 and 56205. These IDEA requirements include students' placement in the least restrictive environment, 20 U.S.C. § 1412(a)(5); Cal. Ed. Code § 56040.1, and the availability of a continuum of placements, including regular classroom environments, 34 C.F.R. § 300.115; *see also* Cal. Ed. Code § 56361.

93.     By the acts and omissions alleged herein, taken under color of law, CDE has denied Plaintiff and others similarly situated their right to a free appropriate public education in the least restrictive environment guaranteed under the IDEA, 20 U.S.C. § 1400 *et seq.*, and the regulations promulgated thereunder, 34 C.F.R. § 300, *et seq.*

94.     CDE promulgated Cal. Code Regs. tit. 5, § 3043(g), which on its face limits the application of the LRE requirement for extended school year services. The regulation permits school districts to offer a limited continuum of placements, without integrated settings, for the extended school year, in violation of the IDEA – even for students for whom general education is their least restrictive environment, such as M.C.

95.     CDE's actions and inactions violate IDEA and its implementing regulations by denying M.C. and others similarly situated LRE, a full continuum of placements, and inclusion supports and accommodations in ESY placements. The effect of CDE's ESY regulation is to limit extended school year services to particular categories of disability: those students whose disabilities preclude placement in general education settings. The effect is also to unilaterally limit the type, amount, and duration of ESY services.

96.     Under color of and in reliance on CDE's regulation, LAUSD maintains policies, in violation of the IDEA, that place any student on an alternate curriculum into a segregated classroom setting for ESY, regardless of the student's individual needs and abilities or the student's LRE or placement during the regular school year. In effect, CDE authorized LAUSD to disregard the least restrictive environment mandate of the IDEA and place M.C. and other similarly situated students in overly restrictive, segregated classroom settings for extended school year services, even though their IEP teams agreed that their LRE during the regular school year was a general education setting.

97.     Other school districts have also successfully relied on Cal. Code of Regs. tit 5, § 3043 to deny extended school year services to students who are otherwise integrated in regular classrooms. *Student v. San Francisco Unified School District*, OAH Case No. N2006100345, Office of Administrative hearings, Special Education Division, State of California (June 18, 2007).[3] On information and belief, school districts all over California also rely on CDE's regulation to deny extended school year services to otherwise eligible students.

98.     To the extent Cal. Code Regs. tit. 5, § 3043(g) purports to limit the IDEA's LRE requirements for ESY placement, it directly conflicts with federal law.

99.     CDE's regulation also states that extended school year services "shall be provided for a minimum of 20 instructional days." Cal. Code Regs. tit. 5, § 3043 (d). LAUSD and other school districts rely on this regulation to offer students no more than 20 days, regardless of the student's individual need and without regard to whether a longer duration is necessary to prevent regression and learning loss. CDE has failed to instruct districts that the 20 days mentioned in Cal. Code Regs. tit. 5, § 3043(d) is a floor and not a ceiling, that the duration of ESY services is an individualized matter and that a district policy limiting ESY to only 20 days violates IDEA and its implementing regulations, and constitutes impermissible pre-determination in violation of IDEA.

100.     By allowing LAUSD and other school districts to maintain such discriminatory policies, CDE has failed in its duty to supervise local school districts and ensure that a free appropriate public education is available to M.C. and similarly situated students. CDE fails to ensure that school districts provide a continuum of placements, offer services in the last restrictive environment and provide needed inclusion supports and accommodations during the extended school year.

---

[3] This administrative decision from the Office of Administrative Hearings is available from that agency's database of decisions: https://www.dgs.ca.gov/OAH/Case-Types/Special-Education/Services/-/media/Divisions/OAH/Special-Education/SE-Decisions/2007/2007---June/2006100345Acc.pdf

101.    As a direct and proximate result of Defendant CDE's violations of the IDEA, Plaintiff and others similarly situated have suffered, and continue to suffer, substantial educational and developmental losses, and have repeatedly been denied an appropriate educational program from which they could receive meaningful educational benefit during extended school year periods.

102.    Plaintiff seeks a permanent injunction prohibiting CDE from promulgating regulations contrary to the IDEA regarding extended school year services. Plaintiff also seeks an injunction directing CDE to rescind 5§ 3043(g) and instruct districts that the requirements of IDEA apply to extended school year services, including LRE and an individualized consideration of needed inclusion supports and accommodations and whether ESY is needed for more than 20 days.

103.    Unless Defendant CDE is enjoined, Plaintiff and similarly situated individuals will continue to be damaged and will suffer irreparable harms.

104.    Plaintiff's claims are systemic and require a systemic, statewide remedy.

105.    The California Office of Administrative Hearings (OAH) has jurisdiction over administrative complaints relating to special education. As a matter of practice and policy, OAH routinely dismisses CDE as a respondent in all administrative hearings.

106.    Naming CDE as a respondent in a complaint before OAH is futile and pointless, because OAH would immediately dismiss CDE from the proceeding.

## THIRD CAUSE OF ACTION

**Violations of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq.
Against LAUSD**

107.    Plaintiff incorporates by reference every allegation contained in the foregoing paragraphs.

108.    M.C. is a qualified individual with a disability within the meaning of the ADA. He has an intellectual disability. This substantially limits one of more major life activities, including communication, cognitive functioning, ability to learn and developing and maintaining relationships.

109.    As a school-aged child, he is qualified to participate in Defendants' educational programs and services. 42 U.S.C. § 12131(2).

110.    Defendant LAUSD is a "public entity" within the meaning of Title II of the ADA.

111.    M.C. is able to participate successfully in a classroom with his non-disabled peers who follow the core curriculum. However, because of his disability, he requires accommodations and modifications to access educational materials. Uncontroverted testimony from the hearing below described robust research findings establishing that access to classrooms in which core curriculum is taught provide far superior learning outcomes for students with disabilities than those which utilize "alternative curriculum." No research has shown that the alternative curriculum materials adopted by LAUSD improve learning outcomes for any students.  Moreover,, the materials used in LAUSD's "alternate curriculum" summer school class are far below M.C.'s academic level. Consequently, any appropriate program for M.C. should include access to core curriculum materials.

112.    M.C. also benefits from interaction and social integration with his non-disabled peers. He has an intellectual disability, which affects his social interaction more than other disabilities such as specific learning disabilities. Being in an environment in which students engage in normative social interactions allows M.C. to observe and model his behavior on that of others. He also benefits from integration with disabled peers without intellectual disabilities who have greater social emotional skills

113.    Like many other disabled students, M.C. is eligible for LAUSD's extended school year program. Because of the nature of his disability, he would otherwise experience learning loss and regression without access to an appropriate educational program over the summer when school is not in session.

114.    One purpose of the special education services to which M.C is entitled is the promotion of social-emotional learning through integration with his non-disabled peers. Another purpose is the development of a student's ability to develop and maintain social relationships.

1    Without extended school year services, M.C. is also at risk of a loss of academic and social-

2    emotional learning and a decline in his ability to interact with peers.

3        115.    LAUSD's decision to place M.C. in an extended summer school program with

4    no access to non-disabled peers and no exposure to the core curriculum substantially impairs

5    ability to maintain his academic skills, and to maintain and develop his capacity for social

6    interaction with his non-disabled peers, which are among the purposes of his educational

7    program.

8        116.    In administering its extended school year program, LAUSD had many options to

9    accommodate M.C.'s disabilities. One option was to arrange a placement with a non-public

10   agency that operates summer programs for non-disabled students, and provide any needed

11   accommodations, such as one-to-one aide. Another option was to place M.C. in a setting with

12   other students with disabilities who are being taught on the core curriculum and whose social

13   and communication skills provide more age-appropriate models. LAUSD had such a class – its

14   extended school year program for students with specific learning disabilities on the core

15   curriculum.

16       117.    However, LAUSD refused to offer any other options for M.C. It refused to place

17   him in the available program with students on the core curriculum and also refused to offer a

18   placement with a non-public agency.

19       118.    LAUSD adopted policies and practices that deny M.C. and others similarly

20   situated the opportunity to participate in an extended school year program that will advance

21   their learning objectives and access appropriate curriculum solely because of the nature of their

22   disability.

23       119.    LAUSD adopted policies and practices that discriminate against students like

24   M.C. who, by reason of their disabilities, require an inclusive setting with their non-disabled

25   peers and are also eligible for extended school year programs because their academic and

26   social-emotional skills will otherwise decline over the summer.

27       120.    LAUSD has administered its extended school year program so as to discriminate

28   against and exclude M.C. and others similarly situated.

---

27

121.     Through its acts and omissions described above, Defendant LAUSD is violating the ADA with regard to M.C. and others similarly situated by:

    a.    Denying them an opportunity to participate in and benefit from educational services that is equal to that afforded other students;

    b.    Failing to provide educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

    c.    Denying the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs;

    d.    Failing to reasonably modify its programs and services as needed to avoid discrimination; and

    e.    Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs.

122.     Congress specifically provided for a private right of action to enforce Title II. 42 U.S.C. § 12133 (incorporating the remedies and enforcement procedures available under Title VI of the Civil Rights Act, which includes a private right of action).

123.     The Title II regulations upon which Plaintiffs rely were promulgated at the specific direction of Congress and do not impose obligations beyond the reach of Title II. 42 U.S.C. § 12134(a).

124.     As a result of the foregoing, M.C. and others similarly situated suffered injury, including, but not limited to, denial of meaningful access to the benefits of a public education and loss of equal educational opportunity.

125.     Because LAUSD's discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendant' actions, M.C. and others similarly situated continue to suffer harm and therefore speedy and immediate relief is appropriate.

126.   Plaintiff seeks injunctive and declaratory relief, damages and attorneys' fees and costs as a result.

## FOURTH CAUSE OF ACTION

### Violations of the Americans with Disabilities Act 42 U.S.C. §12131, et seq. Against CDE

127.   Plaintiff incorporates by reference every allegation contained in the foregoing paragraphs.

128.   CDE is a "public entity" within the meaning of Title II of the ADA. Defendant Thurmond is an official responsible for managing this public entity and supervising its operations.

129.   CDE has adopted Cal. Code Regs. tit. 5, § 3043, which on its face, discriminates against students such as M.C. who, by reason of their disabilities, require an inclusive setting with their non-disabled peers and are also eligible for extended school year programs because their skills will otherwise decline over the summer.

130.   CDE's discriminatory ESY regulation directly resulted in M.C.'s unequal access to the benefits of a public education, and which denied him and others similarly situated from equal opportunities to benefit from the extended school year services.

131.   The injury experienced by M.C. and others similarly situated due to their exclusion from an appropriate ESY program is directly traceable to CDE's administration of the state educational program, its adoption of a discriminatory ESY regulation, and its failure to ensure that LAUSD and other school districts comply with the ADA.

132.   Under the ADA, public entities are liable for discrimination in the programs they administer, even if they are not directly engaged with the disabled individuals who participate in these programs. The ADA applies to "all services, programs, and activities provided or *made available* by public entities." 28 C.F.R. 35.102(a) (emphasis added).

133.   Here, CDE has "made available" special education services through its local educational agencies. "A public entity, in providing any aid, benefit, or service, may not, directly or *through contractual, licensing, or other arrangements,* on the basis of disability" discriminate against individuals with disabilities. 28 C.F.R. § 35.130(b)(1) (emphasis added).

134.    Further, a public entity may not "[a]id or perpetuate discrimination . . . by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program[.]" 28 C.F.R. § 35.130(b)(1)(v).

135.    Under state and federal law, CDE is responsible for the oversight and supervision of local school districts, including LAUSD. 20 U.S.C. § 1412(a)(11)(A); 34 C.F.R. § 300.149(a); *see also* Cal. Ed. Code §§ 56100 and 56205.

136.    CDE has failed to instruct the local school districts that it oversees about the application of the ADA to extended school year services, including by offering services in the most integrated setting and providing any needed accommodations.

137.    CDE has adopted a method of administration that results in discrimination by local education agencies in the provision of ESY services through its ESY regulation and its failure to monitor and supervise local districts, which are part of its educational program.

138.    In addition, CDE's ESY regulation perpetuates discrimination by local districts, which also provide services to the disabled students who are beneficiaries of CDE's public education program.

139.    CDE has failed to ensure that the local school districts that it oversees comply with the ADA regarding extended school year services.

140.    Through its acts and omissions described above, Defendant CDE is violating the ADA with regard to M.C. and others similarly situated by:

> f.    Denying them an opportunity to participate in and benefit from educational services that is equal to that afforded other students;
>
> g.    Failing to provide educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;
>
> h.    Denying the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs;

     i.     Failing to reasonably modify its programs and services as needed to avoid discrimination;

     j.     Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs; and

     k.     Perpetuating the discrimination of local school districts.

141.    Other district courts in California have held CDE accountable for discriminatory actions by school districts, including violations of the ADA. *Emma C. v. Eastin,* 985 F. Supp. 940, 948 (N.D. Cal. 1997). There, the court found that CDE "failed to monitor [the district's] compliance with state and federal laws," denied the state's motion to dismiss and found that the complaint adequately alleged that the state agency "perpetuated this discrimination." *Id.*

142.    Congress specifically provided for a private right of action to enforce Title II. 42 U.S.C. § 12133 (incorporating the remedies and enforcement procedures available under Title VI of the Civil Rights Act, which includes a private right of action).

143.    The Title II regulations upon which Plaintiffs rely were promulgated at the specific direction of Congress and do not impose obligations beyond the reach of Title II. 42 U.S.C. § 12134(a).

144.    As a result of CDE's actions and inaction, M.C. and others similarly situated have suffered injury, including, but not limited to, denial of meaningful access to the benefits of a public education. As a direct and proximate result of the aforementioned acts, Plaintiff has suffered, and continues to suffer loss of equal educational opportunity, due to Defendants' promulgation of discriminatory regulations, and policy-based denial of his access to appropriate programs, accommodations, modifications, services and access required for Plaintiff's disabilities, and its exclusion of Plaintiff.

145.    Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, M.C. continues to suffer harm and therefore speedy and immediate relief is appropriate.

146.     Plaintiff seeks injunctive and declaratory relief, damages and attorneys' fees and costs as a result.

## FIFTH CAUSE OF ACTION

### Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a)
### Against LAUSD

147.     Plaintiff incorporates by reference every allegation contained in the foregoing paragraphs.

148.     Plaintiff M.C. is a qualified individual with disabilities within the meaning of Section 504. He has an impairment – an intellectual disability – that limits his life activities. He is otherwise qualified to participate in and receive benefits from LAUSD's programs and services. 29 U.S.C. § 794(b).

149.     At all times relevant, LAUSD received federal financial assistance as a public educational agency.

150.     Under Section 504, a qualified individual with a disability may not, solely by reason of his/her disability, be subjected to discrimination, excluded from participation in, or denied the benefits of, any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

151.     Under Section 504, the phrase "program or activity" includes a local educational agency. 29 U.S.C. § 794(b)(2)(B).

152.     Recipients of federal financial assistance are prohibited from denying a qualified person with a disability any health, welfare, or other social services or benefits on the basis of disability. 45 C.F.R. § 84.52(a)(1).

153.     Recipients of federal financial assistance may not afford a qualified individual with a disability an opportunity to receive health, welfare, or other social services or benefits that is not equal to that afforded people without disabilities. 45 C.F.R. § 84.52(a)(2).

154.     Recipients of federal financial assistance may not, on the basis of disability, provide a qualified person with a disability health, welfare, or other social services or benefits that are not as effective as the benefits or services provided to others. 45 C.F.R. § 84.52(a)(3).

155.    Recipients of federal financial assistance may not provide any health, welfare, or other social services or benefits in a manner that limits or has the effect of limiting the participation of qualified individuals with disabilities. 45 C.F.R. § 84.52(a)(4).

156.    Recipients of federal financial assistance must ensure that the aids, benefits and services provided "afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement." 34 C.F.R. §104.4(b)(2).

157.    Recipients of federal financial assistance may not "[p]rovide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others," *Id*. at §104.4(b)(1)(iii), and may not "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." Id. at §104.4(b)(1)(ii); see also 34 CFR § 104.43 & 104.44.

158.    Like the regulations implementing the ADA, the regulations implementing Section 504 also prohibit discriminatory methods of administration. "A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State." 34 C.F.R. 34 CFR § 104.4(b)(4); 45 C.F.R. § 84.4(b)(4).

159.    LAUSD has violated Section 504 by adopting, and implementing policies, procedures and methods of administration that discriminate against M.C. and others similarly situated by excluding them from the benefits of extended school year services, and by providing them with a benefit that is not equal to and less effective than that provided to others.

160.    Defendant committed the acts and omissions alleged herein with intent and/or deliberate indifference to Plaintiff's rights, particularly given the length of time the problems persisted and the severity of the problems.

161.    M.C. and others similarly situated have suffered injury, including, but not limited to, denial of meaningful access to the benefits of a public education. As a direct and proximate result of the aforementioned acts, Plaintiff has suffered, and continues to suffer loss of equal educational opportunity.

162.    Because Defendant' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiff is suffering irreparable harm and therefore speedy and immediate relief is appropriate.

163.    Plaintiff seeks injunctive and declaratory relief, damages and attorneys' fees and costs as a result.

### SIXTH CAUSE OF ACTION

### Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a)
### Against CDE

164.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

165.    At all times relevant, Defendant CDE received federal financial assistance as a public educational agency.

166.    CDE violated Section 504 through promulgating, adopting, and implementing a regulation that results in discrimination against M.C., and by failing to oversee local school districts to ensure that they do not discriminate.

167.    CDE has adopted methods of administration that result in discrimination by local education agencies in the provision of ESY services through its ESY regulation, its failure to monitor and supervise local districts, which are part of its educational program.

168.    In addition, CDE's ESY regulation perpetuates discrimination by local districts, which are also agencies of the State of California within the meaning of Section 504. See, e.g., *Emma C. v. Eastin,* 985 F. Supp. 940, 948 (N.D. Cal. 1997) (holding that a recipient of federal funds discriminates on the basis of disability when it perpetuates discrimination by providing assistance to another entity that in turn discriminates).

169.    Defendant committed the acts and omissions alleged herein with intent and/or deliberate indifference to Plaintiff's rights, particularly given the length of time the problems persisted and the severity of the problems.

170.    M.C. and others similarly situated suffered injury in fact, including, but not limited to, denial of meaningful access to the benefits of a public education. As a direct and proximate result of the aforementioned acts, Plaintiff has suffered, and continues to suffer loss of equal educational opportunity.

171.    Because Defendant' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiff is suffering irreparable harm and therefore speedy and immediate relief is appropriate.

172.    Plaintiff seeks injunctive and declaratory relief, damages and attorneys' fees and costs as a result.

## PRAYER FOR RELIEF

Plaintiff prays this Court to enter judgment and provides the following relief:

1.    An Order reversing the OAH Decision in this matter.

2.    An order compelling LAUSD to provide Plaintiff with an appropriate educational program in the least restrictive environment appropriate to meet his needs in accord with 20 U.S.C. section 1412(a)(5).

3.    An order compelling LAUSD to provide Student with compensatory educational services.

4.    A declaration that Defendants' conduct violates the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. and 28 C.F.R. §§ 35.104, 36.104 (the "ADA"); Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 et seq. ("Section 504"); and the Individuals with Disabilities Education Act, 20 U.S.C. § 1412(a)(5).

5.    An order certifying the class and subclass set out above.

6.    An injunction ordering Defendants to comply with Title II of the ADA, Section 504 of the Rehabilitation Act, and the Individuals with Disabilities Education Act.

*M.C. v. LAUSD*, Case No.: 2:20-cv-09127                              Second Amended Complaint

7.     An injunction requiring CDE to withdraw Cal. Code Regs. tit. 5, § 3043(g) and instruct all local education agencies throughout California about the application of IDEA, the ADA and Section 504 to extended school year services, including their duty to offer a continuum of placements, placement in the least restrictive environment, individualized accommodations to access curriculum, and modifications and consideration of students' need for extended school year services beyond 20 days.

8.     Damages and compensatory education in an amount to be determined by proof, including but not limited to damages under 42 U.S.C. § 12133, 29 U.S.C. § 794(a), including all applicable statutory damages to Plaintiff and class members.

9.     Any other such damages as may be allowed under all the above federal and state laws.

10.     Plaintiff's reasonable attorneys' fees and costs incurred in litigating both the administrative due process complaint and the instant action, including, but not limited to, fees arising under 42 U.S.C. §12205, 29 U.S.C. §794(b), and 20 U.S.C. § 1415(i)(2)(B).

11.     Such other and further relief as the Court deems just and proper.

Dated: March 17, 2021

Respectfully submitted,
Vanaman German LLP
Disability Rights California


/s/

David W. German, Attorney for M.C.